{¶ 34} Respectfully, I dissent. I would hold that the trial court erred in denying Burger's motion for summary judgment and, accordingly, would find the other assignments of error moot.
 {¶ 35} At issue is a personal letter written by Burger to Meck on February 23, 2000, the contents of which encompass far more than the limited language selected by the majority. The majority finds that the phrase, "I tell you now that this letter will serve as my personal guarantee to buy your note (singular) within 30 days of written notification that you would like to tender your note (singular) to AmeriCall and cash out" forms an ongoing personal guarantee from Burger of two notes owned by appellees. Nowhere in this letter, however, is there a description of the "note" referenced, either by amount, date of execution, or date of maturity. The law is clear that a "guarantor, like a surety, is bound only by the precise words of the contract." Morgan v.Boyer (1993), 39 Ohio St. 324. Furthermore, a "contract of guaranty will be construed in favor of the guarantor." Liquidating Midland Bank v.Stecker (1930), 40 Ohio App. 510, 516. Here, not only do the words contained in Burger's letter refer only to a note (singular), they apparently refer to a note already in existence. Even if they are construed to form a contract, the record is absolutely devoid as to which of the two notes held by appellees this "guarantee" applies to. The majority simply assumes that the alleged guarantee covers both notes held by appellees.
 {¶ 36} Moreover, "in construing a guaranty, the language used is to be understood in its plain and ordinary sense, as read in the light of surrounding circumstances, the situation of the parties, and the object of the guaranty, and that construction given which most nearly conforms to the intention of the parties." Nelsonville Elec. Mfg. Co. v.Marshall (App. 1957), 76 Ohio Law Abs. 289, 146 N.E.2d 643. Thus, the context in which the letter was written is of major import.
 {¶ 37} There is no dispute that Burger wrote the letter to Meck as a result of a demand by a new financing source (RFC Capital Corp.) that all secured note holders subordinate their security interest to RFC. It is clear that when the entire letter is read in context with RFC's demand, the purpose of the letter is to offer to "buy out" appellees prior to the maturity date of their note(s) should they not mutually agree to subordinate their interest to RFC. In fact, in the letter, Burger advises Meck that "I would be glad to have Bernie (his attorney) draft a more formal commitment which Dominic is free to have his attorney review and modify."
 {¶ 38} It is unrebutted that no formal commitment was requested or drawn. In fact, Meck and Cuttaia, although offered the opportunity by this letter, chose not to cash out their positions, but, rather, agreed to subordinate their security interest to RFC. Significantly, when they made this decision in 2000, the two notes were paying 12 and 13 percent per annum, and appellees' $69,000 investment was paying them $727.50 per month in interest. It is apparent that Meck and Cuttaia accepted the risk of subordination in favor of this lucrative return. It was only after AmeriCall collapsed that appellees came to court and asked that their risk be ameliorated in favor of a "personal guarantee" by Burger. The majority would have us believe that the intent of the parties was that AmeriCall pay 12 and 13 percent interest on an investment that was also personally guaranteed by Burger — something I and any other investor would find most unlikely. Significantly, Meck was not an inexperienced investor. She admitted at trial that over the years she had invested in companies other than AmeriCall and, further, that she had an investment advisor who advised her that an investment in AmeriCall was a "bad decision."
 {¶ 39} It is further unrebutted that Meck and Cuttaia agreed to subordinate their security interest to RFC. In fact, new replacement notes were drawn up in March 2000, and those new notes do not contain Burger's signature as guarantor. In fact, the new notes contain only one signature, that of Jerry Burger as CEO of AmeriCall. If there were any question at that juncture as to the intention of parties concerning Burger's personal guarantee, it is more than resolved by the absence of Burger's personal guarantee on the new notes.
 {¶ 40} Moreover, contrary to the majority's assertion, joint trial exhibit No. 14, a letter from Burger to Meck dated February 1, 2002, does nothing to make Burger's letter of February 23, 2000 ambiguous. First, it is obvious that what happened in 2002 after AmeriCall began experiencing financial difficulties is not relevant to whether Burger guaranteed appellees' note(s) in his February 23, 2000 letter. Furthermore, the majority misquotes the letter to create the purported ambiguity. The letter actually states, "Dear Karen: I am sure you will get some uncomfortable correspondence from RFC. We are engaged in a major battlewith them. I am enclosing a personal money order to cover your interest, which I am paying out of my pocket while we battle." (Emphasis added.) Thus, the majority's assertion that the letter indicates that Burger was battling with Meck is simply not true.
 {¶ 41} A guarantee will not be construed as continuing without express language providing therefor. Nelsonville Electric, supra, and, unlike contracts, ambiguity is construed in favor of the guarantor. LiquidatingMidland Bank, 40 Ohio App. at 516. Here, the majority has taken imprecise language from a personal letter out of context, elevated it to a contract of guarantee, and applied it not only to a past transaction between the parties, but also to two notes executed a month after the purported guarantee was written. This interpretation is not supported by the facts nor the law, and, accordingly, I dissent.